LIVINGSTON COUNTY v DEPARTMENT OF
MANAGEMENT & BUDGET

Docket No. 79074. Argued October 7, 1987 (Calendar No. 3). Decided
June 20, 1988.

Livingston County brought an action in the Court of Claims
against the Department of Management and Budget and the
Department of Natural Resources, seeking reimbursement of
expenditures for landfill improvements necessitated solely be-
cause of compliance with the Solid Waste Management Act.
The court, Robert Holmes Bell, J., granted summary judgment
for the plaintiff. The Court of Appeals, J. H. Gillis, P.J., and
R. B. Burns and Ford, JJ., affirmed in an unpublished opinion
per curiam (Docket No. 82928). The defendants appeal.

In an opinion by Justice Brickley, joined by Chief Justice
Riley and Justices Boyle, Archer, and Griffin, the Supreme
Court held:

The constitutional requirement of reimbursement by the
state to local units of government of the cost of an increase in
the level of any activity or service applies only to increases in
the level of services and activities required by state law. Op-
tional services and activities, such as the voluntary ownership,
operation, and upgrading of a sanitary landfill by a local unit of
government, do not render the state liable for reimbursement.

1. Const 1963, art 9, § 29 requires reimbursement by the state
to local units of government of the cost of an increase in the
level of any activity or service beyond that required by existing
law. As adopted, art 9, § 29 was intended to apply only to
required and not optional activities and services by local units
of government. Thus, a new service or activity cannot be
required by the state of local units of government without state
financial support for any necessary increased costs.

2. The Solid Waste Management Act does not require a
county to own or operate a waste disposal site, and a perceived
need for the availability of a waste disposal site cannot be

REFERENCES

Am Jur 2d, Pollution Control §§ 244-246.
Applicability of zoning regulations to waste disposal facilities of
state or local governmental entities. 59 ALR3d 1244.

translated into an obligation on the part of the state to reimburse local units of government for some of the costs involved in the ownership of a disposal site. Accordingly, there is no liability on the part of the state to compensate the county for any increase in costs attributed to the ownership of the landfill.

Justice CAVANAGH concurred only in the result.

Reversed.

Justice LEVIN, concurring in part and dissenting in part, agreed that while a county is required to provide for the removal of solid waste, it is not required to do so by operating its own sanitary landfill; instead, it might discharge its responsibility by contracting with a privately owned facility within the county or with a publicly or privately owned facility in another county. In this case, the record does not show whether the county could meet its statutory obligation by pursuing such alternatives. Because the trial court found that the county was required to continue operation of its sanitary landfill as a matter of law, the county cannot be faulted for failing to offer evidence to show that it had no alternative but to continue existing operations as a matter of fact. Thus, the county should not be barred from presenting evidence or argument on the issue. The case should be remanded to the Court of Claims for development of a record on the question of the viability of alternatives to the county's continued operation of its own facility.

1. CONSTITUTIONAL LAW — MUNICIPAL CORPORATIONS — STATE REIMBURSEMENT OF COSTS — SANITARY LANDFILLS.

The constitutional requirement of reimbursement by the state to local units of government of the cost of an increase in the level of any activity or service applies only to increases in the level of services and activities required by state law; optional services and activities, such as the voluntary ownership and upgrading of a sanitary landfill by a local unit of government do not render the state liable for reimbursement (Const 1963, art 9, § 29).

2. MUNICIPAL CORPORATIONS — SOLID WASTE MANAGEMENT ACT — SANITARY LANDFILLS.

The Solid Waste Management Act does not require a county to own or operate a sanitary landfill (MCL 299.424; MSA 13.29[24]).

*Cohl, Salstrom, Stoker & Aseltyne, P.C.* (by *Larry A. Salstrom*), for the plaintiffs.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, *Thomas L. Casey,* Assistant Solicitor General, and *James E. Riley, Thomas J. Emery,* and *Sheldon A. Silver,* Assistant Attorneys General, for the defendants.

Amici Curiae:

*Fitzgerald, Hodgman, Cox, Cawthorne & McMahon* (by *Dennis O. Cawthorne* and *James G. Cavanagh*) for Michigan Association of Counties.

*Sondee & Racine* (by *W. Peter Doren*) for Michigan Municipal League and Michigan Townships Association.

BRICKLEY, J. This case involves an interpretation of the Solid Waste Management Act and Const 1963, art 9, § 29, a provision of the Headlee Amendment, which in part, requires the state to appropriate funds to units of local government for the necessary increased costs associated with "an increase in the level of any activity or service beyond that required by existing law . . . ." The specific question in this case is whether application of the provisions of the Solid Waste Management Act to plaintiff's sanitary landfill triggers art 9, § 29's state funding requirement. We hold that Const 1963, art 9, § 29 applies only to services and activities required by state law and that operation of a sanitary landfill is not a required service or activity. Thus art 9, § 29 does not apply in this case. Therefore, we reverse the judgment of the Court of Appeals.

FACTS

In 1972 Livingston County began operating a sanitary landfill which was licensed pursuant to

the garbage and refuse disposal act (GRDA), 1965 PA 87. In January, 1979, the GRDA was repealed and replaced with the more detailed and comprehensive Solid Waste Management Act (SWMA). 1978 PA 641, MCL 299.401 *et seq.;* MSA 13.29(1) *et seq.* Shortly before the adoption of the SWMA, the voters, in the election of November, 1978, amended the Michigan Constitution by adopting the Headlee Amendment, which provides, in part, that the state must appropriate funds for any necessary increased costs associated with "an increase in the level of any activity or service beyond that required by existing law . . . ."[1]

In April, 1980, in order to comply with the SWMA and the rules and regulations promulgated thereunder, Livingston County signed a schedule of compliance with the State Department of Natural Resources. The county then proceeded to upgrade its landfill, undertaking hydrogeological studies and the installation of a leachate collection system and a PVC liner. The county sought reimbursement from the state for the landfill improvements, but the state disavowed any liability. The county then filed suit in the Court of Claims, which found defendant liable for $260,000 expended by plaintiff in upgrading its sanitary landfill.

> This Court must conclude that plaintiff has preponderated with the evidence to demonstrate that plaintiff upgraded its facility to comply with *new and additional state mandated statutes and requirements* under Act 641. . . . This Court further finds that the documented proofs clearly demonstrate that these expenditures totalled $260,000 which would not have been required had defen-

---

[1] The parties have not raised and we therefore do not address the issue whether higher standards for the maintenance of a landfill amount to "an increase in the level" of an activity or service.

dant not required compliance with Act 641. [Emphasis added.]

The Court of Appeals, in a per curiam opinion filed May 1, 1986, affirmed the Court of Claims decision, relying on two earlier Court of Appeals cases involving facts nearly identical to those in this case.[2]

We granted leave and now reverse the judgment of the Court of Appeals.[3]

### ANALYSIS

### I

This case involves an interpretation of the Solid Waste Management Act and Const 1963, art 9, § 29, a provision of the Headlee Amendment. Art 9, § 29 provides as follows:

[2] See *Delta Co v Dep't of Natural Resources,* 118 Mich App 458; 325 NW2d 455 (1982), lv den 414 Mich 954 (1982); *South Haven Twp v Dep't of Natural Resources,* 132 Mich App 222; 346 NW2d 923 (1984), remanded for reconsideration 425 Mich 854 (1986).

[3] We granted leave, 428 Mich 857 (1987), limited to the following four issues:

I. Whether the County of Livingston is required to operate a sanitary landfill and therefore entitled to complain of new standards under Const 1963, art 9, § 29; whether the Solid Waste Management Act, MCL 299.401 *et seq.;* MSA 13.29(1) *et seq.,* is an impermissible attempt to shift responsibility for services to local government as defined by *Durant v State Bd of Ed,* 424 Mich 364; 381 NW2d 662 (1985);

II. Whether the standards expressed in 1978 PA 641 merely particularize standards imposed upon any person, entity, or unit of government operating a landfill by 1965 PA 87 and the Michigan Environmental Protection Act;

III. Whether those standards were enforced before adoption of Const 1963, art 9, § 29; and,

IV. Whether the act implementing Const 1963, art 9, § 29, 1979 PA 101, MCL 21.231 *et seq.;* MSA 5.3194(601) *et seq.,* clearly indicates that statutes such as 1978 PA 641 were not meant to come within the purview of the Headlee Amendment.

Since we resolve this case on the basis of issue I, we do not reach issues II, III and IV.

The state is hereby prohibited from reducing the state financed proportion of the necessary costs of any existing activity or service required of units of Local Government by state law. *A new activity or service or an increase in the level of any activity or service beyond that required by existing law shall not be required by the legislature or any state agency of units of Local Government, unless a state appropriation is made and disbursed to pay the unit of Local Government for any necessary increased costs.* The provision of this section shall not apply to costs incurred pursuant to Article VI, Section 18. [Const 1963, art 9, § 29. Emphasis added.]

The first issue critical to the resolution of this case is whether the second sentence of art 9, § 29 applies to increases in the level of all services and activities, whether optional or required, that are carried on by units of local government or only to increases in the level of those services and activities that are required by state law. The argument made by amicus curiae for the Michigan Municipal League and the Michigan Townships Association goes to the heart of this issue.

The Headlee Amendment states that a "new activity or service . . . shall not be required by the legislature or a state agency" and it states that "an increase in the level of *any* activity or service beyond *that required* by existing law shall not be required by the legislature or any state agency . . . ." Mich Const 1963, art 9, § 29 (emphasis supplied). There is no qualification in the Headlee Amendment that the local governmental activity or service being increased by the state be a service or activity that is *required* to be performed by the local government. The Headlee trigger for state funding is a rise in the level of any local service, even an optional one, beyond the level required as of the Headlee effective date. The

phrase "that required" refers to the "level" of "any activity or service" . . . . It is not the service that need be "required" under Headlee, but only the level. [Emphasis in original.]

The Court of Appeals in this case, as in *Delta Co v Dep't of Natural Resources,* 118 Mich App 458; 325 NW2d 455 (1982), 414 Mich 954 (1982), and *South Haven Twp v Dep't of Natural Resources,* 132 Mich App 222; 346 NW2d 923 (1984), did not reach this issue. Instead, the Court found that the unit of local government was, in effect, required by the overall command of the SWMA to maintain its sanitary landfill, once undertaken.

We have dealt with art 9, § 29, a relatively new provision of the constitution, on only one occasion, in *Durant v State Bd of Ed,* 424 Mich 364; 381 NW2d 662 (1985). While *Durant* is not on point, we did expound upon the scope and purpose of the Headlee Amendment. We explained that in ratifying Headlee the voters sought

to gain more control over their own level of taxing and over the expenditures of the state. It is evident that while the voters were concerned about the general level of state taxation, they were also concerned with ensuring control of local funding and taxation by the people most affected, the local taxpayers. The Headlee Amendment [was] the voters' effort to link funding, taxes, and control. [*Id.,* p 383.]

We also concluded that the Headlee Amendment was "part of a nationwide 'taxpayer revolt' in which taxpayers were attempting to limit legislative expansion of *requirements* placed on local government . . . ." *Id.,* p 378 (emphasis added).

In interpreting art 9, § 29, two basic rules of constitutional construction appear applicable.

The primary rule is the rule of "common understanding" described by Justice Cooley:

"A constitution is made for the people and by the people. *The interpretation that should be given it is that which reasonable minds, the great mass of the people themselves, would give it.* 'For as the Constitution does not derive its force from the convention which framed, but from the people who ratified it, *the intent to be arrived at is that of the people,* and it is not to be supposed that they have looked for any dark or abstruse meaning in the words employed, *but rather that they have accepted them in the sense most obvious to the common understanding* . . . .' (Cooley's Const Lim 81)." . . .

\* \* \*

A second rule is that to clarify meaning, the circumstances surrounding the adoption of a constitutional provision and the purpose sought to be accomplished may be considered. [*Traverse City School Dist v Attorney General,* 384 Mich 390, 405; 185 NW2d 9 (1971). Emphasis in original.]

Unfortunately, application of these two rules of constitutional construction could produce contrary results. While an examination of the purpose of the Headlee Amendment and the circumstances surrounding its adoption indicate that the voters intended art 9, § 29 to apply only to required and not optional activities, it is argued, that a literal reading of the second clause of the second sentence of art 9, § 29 seems to support the position of amicus curiae. The clause "beyond that required by existing law," it is argued modifies the term "level," not "activity or service." This suggests that the Headlee Amendment would apply whenever the state increased the level of any activity, whether optional or required, above the level required at the time of the amendment's enactment.

While amicus curiae makes a plausible argu-

ment from a grammatical standpoint, we must examine the language of a constitutional provision not only in a strictly grammatical context but also in light of the general purpose for which the provision was adopted.

> The primary and fundamental rule of constitutional or statutory construction is that the Court's duty is to ascertain the purpose and intent as expressed in the constitutional or legislative provision in question. Also, while intent must be inferred from the language used, it is not the meaning of the particular words only in the abstract or their strictly grammatical construction alone that governs. The words are to be applied to the subject matter and to the general scope of the provision, and they are to be considered in light of the general purpose sought to be accomplished or the evil sought to be remedied by the constitution or statute. [*White v Ann Arbor,* 406 Mich 554, 562; 281 NW2d 283 (1979). Citation omitted.]

We are persuaded by our understanding of the purpose of the Headlee Amendment, as expressed in its totality, that it was intended to apply only to increases in the level of those services and activities that state law mandates in the first instance. As we said in *Durant,* the Headlee Amendment was intended to "limit legislative *expansion of requirements* placed on local government . . . ."

If we examine the language of art 9, § 29 as a whole, we are left with the firm conviction that this provision of the Headlee Amendment applies only to services and activities required of units of local government. The first sentence of art 9, § 29 clearly limits the reduction of the state-financed portion of the necessary costs of any existing activity or service "required" by state law. There is no ambiguity here about whether or not the activity or service is required. Disregarding the

troubling clause of the second sentence of art 9, § 29, there is also no doubt that a new activity or service cannot be required without state financial support for any necessary increased costs.

Section 29 then at least makes clear its intent to prohibit either the withdrawal of support where already given or the introduction of new obligations without accompanying appropriations, and, in both instances, art 9, § 29 applies only to services or activities required by state law. The question then is why would the drafters or the voters limit the prohibition against the withdrawal of support to "required" activities or services in sentence one, and at the same time, in sentence two, prohibit the unfinanced expansion of an optional activity? Such an interpretation creates a flaw in the logic of the Headlee Amendment's overall plan.

That plan is quite obvious. Having placed a limit on state spending, it was necessary to keep the state from creating loopholes either by shifting more programs to units of local government without the funds to carry them out, or by reducing the state's proportion of spending for "required" programs in effect at the time the Headlee Amendment was ratified. The plan clearly does not prohibit the reduction of the "state financed proportion . . . of any existing activity or service [*not*] required . . . by state law."

Yet under amicus curiae's interpretation plaintiff would be reimbursed for the increased costs allegedly mandated by the SWMA, but due to the unambiguous language in the first sentence of art 9, § 29, a unit of local government that hypothetically was receiving state aid for a landfill at the time of the adoption of the Headlee Amendment could have that support withdrawn. More specifically, to accept amicus curiae's interpretation of

the second clause of the second sentence of art 9, § 29 would place that provision in conflict with sentence one. What sentence two would give, sentence one would take away.

Amicus curiae further argues that many essential services of cities and townships, such as fire protection services, are not mandated by state law and that our interpretation of art 9, § 29 would, in effect, defeat the Headlee Amendment by making these units of local government vulnerable to expensive state regulations. We cannot of course anticipate all of the advantages and disadvantages of what we consider to be the plain and most obvious reading of the Headlee Amendment. It does seem, however, that the most fundamental services, such as fire protection, are already being performed in large measure by units of local government. While the state can, and sometimes does, mandate higher standards, benefits, and so forth, it does not necessarily profit from increasing these standards, and, therefore, the kind of escape hatch for the state that the Headlee Amendment was intended to head off is not created. Unlike the shifting of traditional state functions to units of local government, increasing the costs of services that are currently performed predominantly by units of local government does not lessen the state's financial burden.

Moreover, if we were to accept amicus curiae's argument that the Headlee Amendment applied to increases in the level of even optional activities or services, any unit of local government that had undertaken an optional activity in the past could pass along to taxpayers statewide the cost of improvements. Units of local government, such as plaintiff county, could look to all state taxpayers for the cost of upgrading a voluntarily assumed, quasi-governmental function, such as a sanitary

landfill, whereas taxpayers in an adjoining county that used a private landfill would presumably find charges for using their landfill increased because the private landfill owner could not be reimbursed for upgrading his landfill. That unit of government would in turn have to pass off that increased cost to its own tax base, rather than to that of the entire state. Rather than containing the cost and scope of state and local government as indicated by the Headlee Amendment, this result would encourage local units of government to undertake those services and activities previously provided by private enterprise since state taxpayers as a whole, as opposed to local consumers of the service, would pay for any necessary increased costs associated with the increase in the level of that service or activity.

Lending further support to our conclusion that the second clause of the second sentence of art 9, § 29 refers only to required services and activities is the history of the handling of this issue by the Court of Appeals. Although *Delta Co* and *South Haven Twp,* the two cases cited by the Court of Appeals for support of its result in this case, do not rest on a resolution of the optional versus required activity issue, both panels indirectly addressed this question. In *South Haven Twp, supra,* p 226, the Court expressed some skepticism about the notion that the Headlee Amendment applied to increases in the level of even optional services.

> In short, the circuit court reasoned that where a local government was engaged in an activity prior to adoption of the Headlee Amendment, regardless of whether that activity itself is required by the state or not, any new requirements imposed by the state to lawfully continue that activity fall within the scope of the Headlee Amendment. We find it unnecessary to *so expansively* interpret the scope

of the Headlee Amendment in order to resolve the dispute in the present case. [Emphasis added.]

Moreover, in *Delta Co, supra,* p 461, the Court of Appeals, without specific reference to this issue, nonetheless, paraphrased art 9, § 29 as requiring the state "to provide funds for any new or increased activities or services *the localities by law must offer."* (Emphasis added.)

Furthermore, in dicta in *Durant v State Bd of Ed (On Remand),* 129 Mich App 517, 525-526; 342 NW2d 591 (1983), aff'd in part, rev'd in part, and remanded on other grounds 424 Mich 364; 381 NW2d 662 (1985), yet another panel of the Court of Appeals reached the same conclusion: that art 9, § 29 only applied to increases in the level of required services or activities.

> By specifically enacting § 29, the voters sent two messages to the state Legislature: (1) if the state Legislature required local units of government to provide a certain activity or service and the state was financing a certain portion of the necessary costs of that activity or service, the state could not reduce its share of the necessary costs after § 29 became effective, and (2) if the state Legislature wanted to pass a new law or regulation which either required local units of government to provide a new activity or service, or to provide an *increased level in an existing required* activity or service, the state was required to pay for any resulting increased costs which were necessary for the local unit of government to discharge its duty. [Emphasis added.]

Finally, in *Saginaw Firefighters Ass'n v Saginaw,* 137 Mich App 625; 357 NW2d 908 (1984), the Court of Appeals dealt with a claim by Saginaw fire fighters against the city for overtime pay pursuant to a newly enacted provision of the state

minimum wage law that required overtime pay for municipal fire fighters. The city defended against the action, in part, on the grounds that the statute was unenforceable because the Legislature had failed, as required by the Headlee Amendment, to appropriate funds for any necessary increased costs incurred in paying overtime compensation. The Court of Appeals, without further analysis, rejected the city's argument.

> Const 1963, art 9, § 29, sets restrictions on the state's power to increase costs to local governmental units for activities or services required by state law. This constitutional provision was not violated because state law *does not require* that fire protection be provided by a municipal corporation. [*Id.,* p 630. Emphasis added. Citation omitted.]

Implicit in this conclusion was the Court's assumption that art 9, § 29 only applied to required, not optional, activities or services.[4]

In conclusion, we hold that art 9, § 29 applies only to increases in the level of any service or activity required by state law. Viewed in its entirety, the language of art 9, § 29 supports this conclusion. Moreover, both the purpose behind and the circumstances surrounding adoption of the Headlee Amendment, as well as dicta from several Court of Appeals decisions, indicate that the language "an increase in the level of any activity or service" in art 9, § 29 refers only to required, not optional, services or activities.

---

[4] While the Court of Appeals in *Saginaw Firefighters* did not specifically so state, the requirement for overtime pay did not involve the first sentence of art 9, § 29 and arguably could not have involved "[a] new activity or service" under the second sentence of art 9, § 29. Therefore, the Court could only have been referring to an increase in the "level of any activity or service" under the second clause of the second sentence of art 9, § 29.

II

The second issue necessary to the resolution of this case is whether the SWMA, in effect, required Livingston County to continue to operate and, therefore, to upgrade its sanitary landfill. Plaintiff county concedes that the SWMA does not require counties to own and operate sanitary landfills.[5] Livingston County argues, however, that § 24 of the SWMA imposes on units of local government a mandatory duty, not required under the GRDA, to dispose of solid waste. Section 24 of the SWMA provides as follows:

> A municipality or county *shall assure* that all solid waste is removed from the site of generation, frequently enough to protect the public health, and are [sic] delivered to licensed solid waste disposal areas, except waste which is permitted by state law or rules promulgated by the department, to be disposed of at the site of generation. [MCL 299.424; MSA 13.29(24). Emphasis added.]

As previously noted, the Court of Appeals in this case rested its affirmance of the trial court on *Delta Co* and *South Haven Twp,* two cases that also dealt with the interaction between § 24 of the SWMA and Const 1963, art 9, § 29. In both cases the plaintiff local governments claimed that art 9, § 29 precluded the state from forcing units of local government to comply with the provisions of the SWMA absent an appropriation for any necessary increased costs associated with compliance.

In *Delta Co,* the Court of Appeals affirmed the trial court's judgment which precluded enforcement of the provisions of the SWMA absent state

[5] The SWMA certainly does not restrict the operation of sanitary landfills to units of local government, such as counties. See MCL 299.405(3), 299.410, 299.413; MSA 13.29(5)(3), 13.29(10), 13.29(13).

funding as required by the Headlee Amendment.
The Court, by construing the "shall assure" lan-
guage of § 24, concluded that the SWMA imposed
upon units of local government a mandatory duty
of solid waste disposal not previously required
under state law.

> Uniformly, this Court has held that the word
> "shall" is mandatory. See *State Highway Comm v
> Vanderkloot,* 392 Mich 159; 220 NW2d 416 (1974).
> Moreover, a statute must be read in its
> entirety. . . . Upon review of the entire act, we
> are convinced that the words "shall assure" are
> the equivalent to a command to localities to dis-
> pose of solid waste products. The overall purpose
> of the act is to require localities to develop a solid
> waste management plan. See MCL 299.425-
> 299.430; MSA 13.29(25)-13.29(30).
>
> The next inquiry becomes: Did units of local
> government have mandatory duties with respect to
> solid waste management prior to the adoption of
> the Solid Waste Management Act?
>
> We summarily reject defendant's argument that
> plaintiffs had a pre-existing constitutional duty to
> dispose of solid waste. . . .
>
> [Moreover], as defendant conceded, the prior act
> [the GRDA] imposed no mandatory duties upon the
> local units of government with respect to solid
> waste management.
>
> *          *          *
>
> [Finally,] 1980 AC, R 325.2721(4) cannot be
> viewed as imposing a valid pre-existing duty on
> municipalities equivalent to the regulations now
> sought to be enforced. The reliance on the rule to
> avoid the purview of the Headlee Amendment is
> misplaced. *The duties under the Solid Waste Man-
> agement Act clearly are "new or increased."* [*Id.,*
> pp 462-463, 465-466. Emphasis added.]

In *South Haven Twp,* the Court of Appeals once
again tackled the issues raised by the interaction

of the language in the SWMA and the second sentence of art 9, § 29. The Court concluded that the Headlee Amendment mandated state funding for new, post-Headlee requirements which the DNR sought to impose on the township pursuant to the SWMA. As in *Delta Co,* the Court found that § 24 imposed on units of local government a new duty to assure the disposal of solid waste.

> We agree with the holding in *Delta County v Dep't of Natural Resources,* 118 Mich App 458; 325 NW2d 455 (1982), lv den 414 Mich 954 (1982), that § 24 imposes upon municipalities a new duty to take steps necessary to assure the proper disposal of solid waste. We reject as contrary to the plain language of the statute [the DNR's] contention that § 24 does not impose any such duty.
>
> The record in the present case reflects that petitioner's operation of its landfill, while initially voluntarily undertaken under the predecessor statute, is now required to satisfy its duty under § 24 of the Solid Waste Management Act. Consequently, any new, post-Headlee requirements for licensure imposed under the Solid Waste Management Act, i.e., requirements which did not exist under the pre-Headlee predecessor statute or rules promulgated thereunder, constitute state laws requiring an increased level of activity by petitioner, and thus may not be enforced by defendant unless petitioner is provided with state funds to cover any necessary increased costs. *Delta County, supra;* Const 1963, art 9, §§ 25, 29. [*South Haven Twp, supra,* 227.]

We assume, for the sake of argument, that the Court of Appeals in *Delta Co* and *South Haven Twp* was correct in stating that § 24 "imposes . . . a new duty to take steps necessary to assure the proper disposal of solid waste." However, we disagree with the conclusion in those cases, as well as in this case, that the perceived need for the

availability of a waste disposal site can be trans-
lated into an obligation on the part of the state to
reimburse a local unit of government for some of
the costs involved in the ownership of a disposal
site.

If § 24 clearly places upon a county the responsi-
bility to ensure that "all solid waste is removed
from the site of generation . . . and . . . delivered
to licensed solid waste disposal areas," the state
presumably would be required to reimburse for the
cost of that which is required. But as plaintiff-
appellee concedes, § 24 clearly does not require the
ownership or operation of a waste disposal site. It
is important to note that plaintiff county has not,
to our knowledge, sought reimbursement of the
costs of collecting, transporting, or disposing of
solid waste. Rather, the county claims that it "is
both required to operate the landfill and required
to increase the level of activity or service required
for that operation"; accordingly, it seeks not the
cost of disposing of solid waste, but the cost of
upgrading its landfill irrespective of the cost of
waste disposal. This claim is based on the fact
that, since plaintiff owns the only licensed landfill
in the county, the mandates of § 24 mean that it
either must comply with the upgrading of its
landfill pursuant to other sections of the act or be
in violation of the mandate of § 24 to "assure" the
disposal of solid waste.

While the record does not indicate the degree of
difficulty plaintiff would encounter in disposing of
solid waste if it did not continue the operation of
its landfill,[6] we have no reason to gainsay the fact
that its continued operation would be beneficial.
We also do not doubt that the alleged newly

[6] Note that the Court of Claims resolved the question of defendants'
liability on the basis of a motion for partial summary judgment.

mandated requirements for the operation of the landfill would add to the cost of disposing of waste. However, the $260,000 cost of the landfill improvements arrived at by the trial court is part of the cost of the ownership of the landfill, not the cost of its use. It is the latter that, arguendo, is mandated, not the former.

The heightened requirements for the licensure of a disposal area were not directed solely to public owners. To the contrary, the statute encourages, as a matter of policy, the continued operation of privately owned landfills.[7] It is a regulatory measure, like many others passed by the Legislature, that applies new technology to everyday activities in the private and public sector.

Under the holding of the court below, the added costs of regulating the many optional services of government would have to be accompanied by an appropriation, if it could be shown to be related to the carrying out of a required service or activity, before that increased regulatory cost is translated into the recoverable cost of that required service or activity. We do not think this complies with either the express language of art 9, § 29, or its overall intended purpose.

### CONCLUSION

We therefore find no liability on the part of the defendants to compensate the plaintiff for any

[7] Section 35 of the SWMA evidences a legislative intent to encourage the continued participation of the private sector in the solid waste disposal and transportation business. Section 35 provides as follows:

This act is not intended to prohibit the continuation of the private sector from doing business in solid waste disposal and transportation. This act is intended to encourage the continuation of the private sector in the solid waste disposal and transportation business when in compliance with the minimum requirements of this act. [MCL 299.435; MSA 13.29(35).]

increased costs attributed to the ownership of its
sanitary landfill. Reversed.

RILEY, C.J., and BOYLE, ARCHER, and GRIFFIN,
JJ., concurred with BRICKLEY, J.

CAVANAGH, J., concurred only in the result.

LEVIN, J. (*concurring in part and dissenting in
part*). I concur with part I of the majority opinion
but disagree with part II. I would remand for the
development of a record on the question whether
Livingston County was in fact required to operate
a sanitary landfill to comply with the provisions of
the Solid Waste Management Act.

The majority holds that while § 24 of the SWMA[1]
requires that the county provide for the removal of
solid waste, it does not require that the county do
so by operating a sanitary landfill. Because the
majority finds that the operation of a sanitary
landfill is not a required activity, it concludes that
necessary expenditures made by the county to
assure the continued operation of the Livingston
County sanitary landfill are not within the ambit
of the Headlee Amendment[2] and therefore need
not be reimbursed by the state.

The question whether the county was required

---

[1] Section 24 of the Solid Waste Management Act provides:

    A municipality or county shall assure that all solid waste is
    removed from the site of generation, frequently enough to
    protect the public health, and are [sic] delivered to licensed
    solid waste disposal areas, except waste which is permitted by
    state law or rules promulgated by the department, to be dis-
    posed of at the site of generation. [MCL 299.424; MSA
    13.29(24).]

[2] The Headlee Amendment in relevant part provides:

    The state is hereby prohibited from reducing the state
    financed proportion of the necessary costs of any existing
    activity or service required of units of Local Government by
    state law. A new activity or service or an increase in the level
    of any activity or service beyond that required by existing law

to continue operation of its sanitary landfill to meet its statutory obligation to remove solid waste was resolved by partial summary judgment in the Court of Claims. The Court of Claims judge was persuaded that continued operation of the sanitary landfill was required by controlling decisions of the Court of Appeals. See *Delta Co v Dep't of Natural Resources,* 118 Mich App 458; 325 NW2d 455 (1982), lv den 414 Mich 954 (1982); *South Haven Twp v Dep't of Natural Resources,* 132 Mich App 222; 346 NW2d 923 (1984), remanded for reconsideration 425 Mich 854 (1986).[3] Since that question was resolved in favor of Livingston County as a matter of law, the county was not called upon to offer evidence to show that the only way it could realistically meet its statutory obligation to remove solid waste was through the continued operation of its sanitary landfill facility.

The trial proceeded on the assumption that the county was obliged to continue operation of its sanitary landfill. Evidence was introduced solely on the question whether § 24 of the SWMA imposed new requirements or merely particularized the standards of preexisting requirements contained in the SWMA's precursor, the garbage and refuse disposal act, MCL 325.291 *et seq.;* MSA 14.435(1) *et seq.* The Court of Claims concluded that the SWMA did impose new requirements and, on the basis of the Headlee Amendment, ordered the state to

shall not be required by the legislature or any state agency of units of Local Government, unless a state appropriation is made and disbursed to pay the unit of Local Government for any necessary increased costs. The provision of this section shall not apply to costs incurred pursuant to Article VI, Section 18. [Const 1963, art 9, § 29.]

[3] The majority discusses these decisions at length. *Ante,* pp 649-652.

reimburse the county for the costs incurred to satisfy the new requirements.

The Court of Appeals, relying on its earlier decisions in *Delta Co* and *South Haven Twp,* affirmed the conclusion of the Court of Claims that Livingston County was required to operate its sanitary landfill to satisfy its obligations under § 24 of the SWMA and affirmed the order of reimbursement.

I agree with the majority that § 24 of the SWMA, in requiring that the county assure that waste finds its way from the point of generation to a licensed waste disposal area, does not require that the county operate its own waste disposal facility. The statutory obligation set forth in § 24 might be met by the operation of a privately owned facility located in Livingston County or a publicly or privately owned facility located in another county. The record does not show whether Livingston County could reasonably meet its statutory obligation by pursuing an alternative to the continued operation of its sanitary landfill.

The Court of Claims agreed with Livingston County, on the authority of *Delta Co* and *South Haven Twp,* that the county was required to continue to operate its sanitary landfill as a matter of law. The county therefore cannot be faulted for failing to offer evidence that it had no alternative but to continue to own and operate the existing facility. Livingston County should not be barred from presenting evidence or argument on an issue that was regarded at trial as settled as a matter of law.

It might appear, on the remand that I would order, that no private entity could be found to operate a facility in Livingston County at commercially feasible rates and that facilities in neighbor-

ing counties would refuse, on economic or other grounds, to dispose of Livingston County's waste. If that should be the case, then it might appear that the county's statutory obligation could only be met —as a matter of fact—by the continued operation of this sanitary landfill. The Headlee Amendment then might require reimbursement by the state if the Court of Claims did not err in concluding that Livingston County's expenditures were made to meet new requirements imposed by the SWMA.[4]

I would remand to the Court of Claims for development of a record on the question of the viability of alternatives to Livingston County's continued operation of its own sanitary landfill facility.

---

[4] See n 2.